IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LEXINGTON INSURANCE COMPANY,

          OPINION AND ORDER

     Plaintiff,

          11-cv-598-bbc

  v.

THE WHESCO GROUP, INC., FIREYE, INC.
and INVENSYS OPERATIONS MANAGEMENT,

     Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     In this civil suit, plaintiff Lexington Insurance Company, as subrogee of the State of Wisconsin, is suing defendants The Whesco Group, Inc., Fireye, Inc. and Invensys Operations Management for damages incurred by a boiler explosion at the University of Wisconsin-Whitewater. Jurisdiction is present under 28 U.S.C. § 1332 because there is more than $75,000 in controversy and plaintiff's citizenship (Massachusetts) is diverse from the citizenship of Whesco (Wisconsin), Fireye (New Hampshire) and Invensys (Texas).

     Defendants Whesco and Fireye have each moved for summary judgment on all of plaintiff's claims. (Defendant Invensys did not file a motion for summary judgment.) In its motion for summary judgment, Whesco contends that it is entitled to summary judgment because all of its actions related to the boiler were taken in its role as a government contractor and thus, it is protected by the doctrine of governmental immunity. Dkt. #109. Additionally, Whesco contends that holding it liable for damages caused by the boiler

1

explosion would violate public policy because the extent of the damages were not a foreseeable result of the limited work Whesco performed on the boiler. For its part, Fireye contends that plaintiff has not produced evidence sufficient to show that Fireye's product was defective or that it contained inadequate warnings. Additionally, Fireye contends that plaintiff cannot succeed on its breach of contract claim.

I am denying defendant Whesco's motion in full. Whesco has not shown that it is entitled to government immunity and its public policy arguments are premature. I am granting defendant Fireye's motion in part and denying it in part. I am granting the motion with respect to plaintiff's breach of contract claims and claims that Fireye failed to provide adequate warnings and designed its product with an unsafe default purge time. I am denying the motion with respect to plaintiff's claim that Fireye negligently designed its product and created an unreasonably dangerous product by failing to incorporate safety and monitoring features relevant to fuel change procedures in dual fuel boilers.

From the facts proposed by the parties and the evidence in the record, I find the following facts to be material and undisputed.

## UNDISPUTED FACTS

### A. Boiler #5

The University of Wisconsin-Whitewater has a central heating plant that provides backup steam for the campus's heating systems. The plant houses various boilers that generate steam for the campus, including boiler #5, the steam generator at issue in this case.

Boiler #5 was manufactured in 1970, and built on UW-Whitewater's campus in 1972.

In 1996-1997, the university undertook a project to modify boiler #5 for service as a standby steam generator. The modification project called for several changes to the boiler. The existing gas and oil burners on the boiler were replaced with a Todd Combustion, Inc. "integrated" burner system that permitted the boiler to be operated on natural gas or fuel oil. Also, a Fireye flame monitor control system E110, designed and manufactured by defendant Fireye, Inc. was added. Some components on boiler #5 were replaced using components from other existing university boilers that were removed from active service, including certain boiler controllers.

The state hired private contractors to perform the work. Defendant Whesco bid to be a subcontractor for a limited part of the 1996-1997 project, but was not chosen initially to perform any work. After complications emerged with the reused controller systems, the state asked Whesco to provide programming and setup assistance for the reused controllers. Whesco refused initially, but eventually agreed because of its longstanding relationship with the state. It was paid less than $20,000 for its assistance. Whesco continued to provide service on boiler #5 between 1997 and 2008. There was no comprehensive service agreement in place and Whesco never agreed to accept responsibility for overall safety, control or maintenance of the boiler. Rather, Whesco responded to specific requests from UW-Whitewater for service on the boiler.

After the 1997 modifications, the boiler was placed on standby service and was used infrequently to create steam for the university, between one and three days a year. The

boiler was also tested once a week, during which time it would run for about two-and-a-half hours. David Floyd, UW-Whitewater Steam Plant Superintendent, knew that leaving the boiler inactive for long periods of time could cause mechanical complications and that the best way to keep the boiler in good shape was through long-term continual operation. Floyd Dep., dkt. #114, at 111-12.

### B. The Fireye Flame Monitoring System

Boiler #5 had a Todd Combustion burner system that incorporated a Fireye E110 flame monitoring system. The Fireye system was designed to sense the presence or absence or a flame within the boiler. If the boiler fails to ignite or if the boiler's flame fails, the Fireye system engages, stops the flow of fuel to the burner through a safety lockout and indicates the reason for the lockout. The Fireye system was designed to be used in single or dual fuel burners. However, the Fireye system is not designed or intended to monitor the fuel change procedure for dual fuel burners.

Additional safety mechanisms can be wired into the Fireye flame monitoring system, including air switches, temperature switches, gas and oil pressure switches and oxygen analyzers. If control switches are wired into the Fireye, they are wired in a series. If one of the switches opens, the Fireye's electrical signal is lost and it locks out, closing the fuel valves in the boiler. Todd Combustion, the designer of the burner system in use in boiler #5, did not wire additional safety mechanisms into the Fireye.

The Fireye EP160 was the programmer "brains" of the Fireye E110 flame monitoring

system. Among other things, the EP160 programmer insured that there was a pre-ignition system purge that swept the boiler with fresh air for a specified period of time in order to prevent a combustible mixture from existing anywhere in the furnace system at the time of ignition. The EP160's pre-purge cycle could be set between 30 seconds to 30 minutes. The EP160 came preset with a factory default 30-second purge time, but could have been set anywhere between 30 seconds and 30 minutes using a series of dipswitches on the side of the EP160. The EP160 manual instructed users to refer to a table on dipswitch functions to properly set the purge time. The manual also stated:

> WARNING: THE INAPPROPRIATE SELECTION OR APPLICATION OF A PROGRAMMER MODULE COULD RESULT IN AN UNSAFE CONDITION HAZARDOUS TO LIFE AND PROPERTY. The various programmer modules [including the EP160] are interchangeable because they plug into a common chassis. Changing the dipswitches modifies the operation of each programmer module. Care should be taken to insure the proper dipswitch settings. Selection of the programmer module and setting the dipswitches for a particular application should be made by a competent professional, such as a Boiler/Burner technician licensed by a state or other government agency, engineering personnel of the burner, boiler, or furnace manufacturer (OEM) or in performance of duties based on information from the OEM.

Dkt. #120-2 at 6.

The appropriate purge time varies depending on the size of the boiler, but National Fire Protection Association (NFPA) standards, NFPA 85, "Boiler and Combustion Systems Hazardous Code," Section 5.5.2.61 provides that a pre-ignition purge "shall be for at least 8 air changes." Dkt. #138-1. A 30-second purge time can be inadequate for many large boilers.

In 2002, the Fireye EP160 programmer module needed to be replaced. Defendant

Whesco ordered a replacement Fireye EP 160, which was shipped directly to UW-Whitewater. UW employees installed the EP160 module without adjusting the Fireye's factory default 30-second purge time. Whesco did not provide any instruction or onsite technical services regarding the EP160's installation.

### C. The 2008 Project

By 2008, problems had developed with the reused combustion controllers installed in 1997 on boiler #5. Floyd and other state engineers agreed that the controllers should be replaced. The state drafted a proposal that called for replacing the failing combustion controllers, the installation, wiring and configuration of new controllers and the post-installation setup, calibration and test firing of the boiler using both oil and natural gas. Floyd and other state engineers developed and designed the scope of the project. The state considered the project to be "small" and limited, with an estimated budget of $22,500.

The scope and plan for the project were set forth in a 15-page specification book prepared by state engineers and approved by Floyd. Dkt. #114-4. The specification book called for the installation of new boiler controllers plus a remote water level indicator on boiler #5. The specification book outlined applicable codes and standards to be followed in executing the project and defined which parts of the boiler were to be replaced, which parts should be removed and returned to the state and which should remain. The specification book kept in place the same basic boiler design and specifications from the 1997 rebuild. Many parts were not replaced, in order to keep costs down, though Floyd

knew that the reuse of component parts installed in a rarely used boiler was not the best and preferred practice. Floyd Dep., dkt. #114, at 153-54.

The specification book required the boiler to be tested and calibrated after the replacement work was completed. It did not state explicitly how the contractor should perform the task of starting up, testing and calibrating the boiler equipment after installation, but stated that "[a]ny installation procedures not specified herein shall be completed in accordance with the manufacture's recommendations and good engineering practice." Dkt. #114-4 at 231. The specifications also noted that, "[p]rior to starting, the contractor shall call to the attention of the Project Manager any materials or apparatus believed to be inadequate and any necessary items of work omitted." Id. at 230.

Floyd chose defendant Whesco to perform the work set forth in the specification book and the state issued Whesco a purchase order for $21,476 to perform the project. At the time Whesco accepted the project and began performing the work, Whesco's technicians did not know that the Fireye EP160's default purge time of 30 seconds was in place.

### D. The Explosion

After Whesco employees had completed the controller and wiring installation work, they proceeded to undertake testing, calibration and startup operations. On April 16, 2008, Whesco employees Terry Flynn and John Seboth arrived to test fire the boiler. They did so using natural gas first. The boiler ran on natural gas without any problems. They then attempted to test fire the boil using oil. After they pressed the "request fuel changeover

button," the fuel changeover sequence stopped and the Fireye system locked out, indicating a low airflow condition. Flynn then set the boiler outlet damper to manual control and opened the damper fully so that airflow into the boiler would be unrestricted. Flynn started the boiler again, but there was a second lockout, as well as a low oil pressure alarm. Flynn tried a third time, but the Fireye control locked out a third time and displayed a "check programmer" message. Flynn removed the Fireye unit to verify the wiring and then reinstalled it after finding no problems. Flynn tried a fourth time, with no success, and Seboth noticed that the atomizing air pressure valve on the boiler was not open. Seboth opened the closed valve and Flynn attempted to start the boiler again. The boiler's ignition light turned on and the boiler exploded. The explosion damaged the boiler and the surrounding building. Plaintiff paid the state more than $5 million for the damage arising from the boiler explosion.

### E. Post-Explosion Investigation

The Fireye flame monitoring system was tested after the explosion. It exhibited the correct lockout messages when tested and locked out in each instance it was expected to. There was no evidence that it malfunctioned prior to or during the explosion.

Defendant Fireye's expert, George Wandling, believes that the explosion was caused by Seboth's opening the quarter turn shut off valve. Wandling Rep., dkt. #100 at 4. The valve is used to purge the fuel supply line and oil gun into the burner. When Seboth opened the valve, it applied air pressure to the main oil supply line attached to the oil gun and forced

fuel oil into the boiler's combustion chamber. The fuel oil was then ignited by the boiler's hot refractory to produce the explosion. Dkt. #100 at 19. According to Wandling, Seboth should not have opened the valve without an established flame at the pilot or main burner. Because there was no flame, the fuel oil purged into the boiler and vaporized, causing an explosion. It is Wandling's opinion that Seboth's action violated the instructions provided in the Todd Construction manual and the National Fire Protection Association standards that applied to the boiler burner.

Plaintiff's experts, James Kittrell and Carl Dupre, believe that the explosion was caused by multiple factors. Kittrell and Dupre Rep., dkt. #120-3. They concluded that defendant Whesco failed to comply with particular specifications supplied by UW-Whitewater and configured and wired the fuel controllers improperly. They also conclude that Whesco should have analyzed the purge time and realized that it was inadequate. Id. at 29-30. Kittrell and Dupre also assign some of the blame to defendant Fireye, concluding that Fireye's design should have contained provisions for monitoring fuel change procedures and providing a safety shutdown for low oxygen situations. Id. at 34.

OPINION

A. Defendant The Whesco Group, Inc.'s Motion for Summary Judgment

Standing in the position of the State of Wisconsin, plaintiff brought breach of contract, negligence, strict liability and breach of warranty claims against defendant Whesco arising from its work on boiler #5. Whesco has moved for summary judgment on the

grounds of governmental immunity and public policy considerations.

1. Government contractor immunity

Defendant Whesco contends that it is immune from plaintiff's claims because it was performing pursuant to a government contract with the state at all times in which it worked on the boiler. Whesco cites Wis. Stat. § 893.80(4) as the basis for immunity. Under that statutory provision, "[n]o suit may be brought against [any governmental entity] . . . or against its officers, officials, agents or employees for acts done in the exercise of legislative, quasi-legislative, judicial or quasi-judicial functions." Wis. Stat. § 893.80(4). Under certain circumstances, this statute can provide immunity to government contractors. However, a government contractor has immunity under § 893.80(4) only if (1) it was acting as an "agent" of the government and (2) the allegedly injurious conduct was caused by implementation of a decision for which immunity is available for government entities, namely, decisions that are "legislative, quasi-legislative, judicial or quasi-judicial." Showers Appraisals, LLC v. Musson Brothers, 2013 WI 79, ¶¶ 34-35, — Wis. 2d— , —N.W.2d—.

As an initial matter, there is a question whether defendant Whesco can assert state government immunity in a case in which it is being sued by the state's insurer standing in the place of the state. Fischer v. Steffen, 2010 WI App 68, ¶ 19, 325 Wis. 2d 382, 397, 783 N.W.2d 889, 896, aff'd, 2011 WI 34, 333 Wis. 2d 503, 797 N.W.2d 501 (subrogated insurer "stands in the shoes" of its insured). In other words, this case is the same as if the State of Wisconsin were suing Whesco. Whesco has not cited any cases suggesting that a

state would be prohibited by immunity principles from suing a contractor with whom it had a contract and such a result makes no sense. The doctrine of governmental immunity exists to protect the state from suit, not to preclude the state from recovering for the negligent performance of a contract by a contractor. To prohibit a state from suing a contractor would render the state's contract meaningless.

However, even assuming that there are some cases in which a government contractor could assert governmental immunity against the state or the state's subrogated insurer, defendant Whesco has not shown that this is such a case. Both plaintiff and Whesco focus on the "agent" part of the test for contractor immunity, which requires the contractor to show that (1) the governmental authority provided reasonably precise specifications; (2) the contractor's actions conformed to those specifications; and (3) the contractor warned the supervising governmental authority about the possible dangers associated with those specifications that were known to the contractor but not to the governmental officials. Showers, 2013 WI 79, ¶¶ 29-31 (citing Estate of Lyons v. CNA Insurance Companies, 207 Wis. 2d 446, 457, 558 N.W.2d 658, 663 (Ct. App. 1996)). Plaintiff and Whesco disagree about whether UW-Whitewater staff provided Whesco with reasonably precise specifications regarding the 2008 boiler work and whether Whesco performed according to the specifications.

Neither party discusses the second part of the government contractor immunity test, which I find to be dispositive. The second part of the test requires defendant Whesco to show that its actions that caused the alleged injuries to state property were "legislative, quasi-

11

legislative, judicial or quasi-judicial." In this case, the actions at issue are Whesco's alleged negligent performance of its contractual obligations, including its alleged failure to comply with certain fire protection standards, failure to verify the status of the Fireye EP160 purge time and defective installation of the combustion controllers. However, the Wisconsin Supreme Court explained in Showers that government contractors are not entitled to immunity for negligent performance of contract work, because such work does not qualify as "legislative, quasi-legislative, judicial or quasi-judicial." Showers, 2013 WI 79, ¶ 39 ("[A]n allegation of negligent workmanship would not have the potential for immunity under § 893.04(4).") The Court explained that "if the allegations . . . were not that the [government] design was a cause of the accident, and were instead that the contractor did not [perform its work] in a workman-like manner and thereby caused injury, such an allegation would not implicate a legislative, quasi-legislative, judicial or quasi-judicial function under Wis. Stat. § 893.50(4)." Id., id. at ¶ 46 (citing Gaunt & Haynes, Inc. v. Moritz Corp., 485 N.E.2d 1123, 1126 (Ill. App. Ct. 1985) ("[I]t is well settled that this rule of non-liability does not exempt a contractor from liability where the injury arises from the contractor's negligent performance of the work."), and Rodriguez v. New Jersey Sports & Exposition Authority, 472 A.2d 146, 149 (N.J. App. Div. 1983) ("A public contractor may . . . be held liable when negligent in the execution of the contract.")).

Thus, in Showers, the Court concluded that the contractor was not entitled to immunity because the claims concerned the contractor's alleged negligence performance of construction duties, not the government's design or specifications. Id. at ¶¶ 52-54.

Similarly, plaintiff's claims in this case are premised on defendant Whesco's alleged negligent performance of its contract with the state, not with the boiler design or specifications provided by the state. Therefore, Whesco is not entitled to governmental immunity.

2. Public policy

Defendant Whesco contends that the court should grant summary judgment in its favor with regard to all of plaintiff's claims for policy reasons. Whesco contends that if it is found liable for the boiler explosion, damages against it would be out of proportion to its culpability. In particular, Whesco contends that it should not be held liable for $5 million in damages on the basis of a $21,000 contract. Additionally, Whesco argues that the state should be held ultimately responsible for the explosion. The boiler was the state's responsibility and it was the state's decision to continually rebuild the boiler instead of purchasing a new one that led to the explosion.

Under Wisconsin law, public policy considerations may preclude the imposition of liability on a defendant, even where it has been proven that negligence was a cause-in-fact of the injury. Peters v. Menard, Inc., 224 Wis. 2d 174, 191-94, 589 N.W.2d 395, 405 (1999). Such considerations include whether:

> (1) The injury is too remote from the negligence; or (2) The injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or (3) in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or (4) because allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or (5) because allowance of recovery would be too likely to open the way for fraudulent claims; or (6) allowance of recovery would enter a field that has no sensible or just stopping point.

Id. at 194.

However, the Wisconsin Supreme Court has explained that "[b]efore determining whether public policy considerations preclude liability, it is usually a better practice to submit the case to the jury." Gritzner v. Michael R., 2000 WI 68, ¶ 26, 235 Wis. 2d 781, 794, 611 N.W.2d 906, 913-14; Sawyer v. Midelfort, 227 Wis. 2d 124, 141, 595 N.W.2d 423 (1999) ("The denial of liability upon public policy grounds is best determined following a trial and a full consideration of the facts."). This is particularly true in a case involving complex facts. Bowen v. Lumbermens Mutual Casualty Co., 183 Wis. 2d 627, 655, 517 N.W.2d 432, 443 (1994) ("[W]hen the issues are complex or the factual connections attenuated, it may be desirable for a full trial to precede [a court's policy] determination.").

I conclude that defendant Whesco's public policy arguments are premature. There are genuine factual disputes regarding the cause of the explosion and which parties were responsible. There are also genuine disputes about the damages that can be attributable to the explosion and Whesco's actions. Therefore, I will deny Whesco's motion for summary judgment on the grounds of public policy. Whesco is free to raise public policy arguments after the trial on the merits of plaintiff's claims.

### B. Defendant Fireye, Inc.'s Motion for Summary Judgment

Plaintiff has asserted against defendant Fireye claims for negligence, strict products liability and breach of contract to which plaintiff was a third party beneficiary, all premised on Fireye's design and manufacture of the flame monitor that was incorporated as a

component within the Todd Combustion burner management system for boiler #5. Fireye has moved for summary judgment on all of plaintiff's claims. Plaintiff concedes in its response brief that its breach of contract claim should be dismissed. Plt.'s Br., dkt. #119, at 2, n. 1. Therefore, I will grant Fireye's motion for summary judgment on that claim.

With respect to its negligence and product liability claims, plaintiff asserts three theories: (1) the Fireye flame monitor was designed defectively because it failed to include provisions to shut down the boiler under unsafe dual fuel conditions; (2) the Fireye flame monitor was designed defectively because it contained no safeguards to prevent the installation or operation of the programmer module with the default 30-second purge time on a boiler that needs a longer purge time; and (3) the Fireye flame monitor contained inadequate warnings. To succeed on its design and warning defect claims under a theory of negligence, plaintiff must show that defendant Fireye failed to exercise ordinary care in the design of its Fireye flame monitor product and warnings and that Fireye's defective design and warnings caused the state's injuries. Gritzner v. Michael R., 2000 WI 68, ¶ 19, 235 Wis. 2d 781, 790-91, 611 N.W.2d 906, 912. To succeed under a theory of strict liability, plaintiff must show that there were foreseeable risks of harm posed by the product that "could have been reduced or avoided by the adoption of a reasonable alternative design [or the provision of reasonable instructions or warnings] by the manufacturer and [that] the omission of the alternative design renders the product not reasonably safe." Wis. Stat. § 895.047(1)(a).

15

1. Inadequate warnings

Plaintiff contends that defendant Fireye's flame monitor product contained inadequate warnings. The problem with this claim is that plaintiff does not identify specifically which warnings were inadequate or what additional warnings should have been provided. Plaintiff's only evidence in support of its warnings argument is a statement from one of its expert reports regarding the default purge time, in which the expert states that the EP160 programmer module can be installed and "will function normally, *without any warnings*, and without any adjustment to the factory default settings." Kittrell and Dupre Supp. Rep., dkt. #120-6, at 6 (emphasis added). However, this is a new opinion that was submitted improperly, so I will not consider it. In any event, did, the statement was not made in the context of a discussion about the adequacy of warnings. Even if it were, it would not be sufficient to prove that the Fireye flame monitor contained such insufficient warnings that there was a foreseeable risk of harm or the product was rendered unsafe.

Plaintiff makes no effort to analyze the warnings that were actually given with the Fireye flame monitor instructions. In particular, the Fireye EP160 manual contained a warning that described the danger of having unqualified individuals alter (or fail to alter) the dipswitch settings that dictate the boiler's purge time. Dkt. #120-2, at 6 (stating that improperly setting the dipswitches "could result in an unsafe condition hazardous to life and property," and that "setting the dipswitches for a particular application should be made by a competent professional"). The manual also warned that installers "must be trained and qualified." Id. Plaintiff does not argue that these warnings were insufficient or that they

16

rendered the Fireye flame monitor unsafe. Therefore, I will grant summary judgment to defendant Fireye on plaintiff's failure to warn claims.

2. Defect in default purge time

Plaintiff contends that defendant Fireye was negligent and created an unsafe product by designing the EP160 with a 30-second default purge time. However, the only evidence plaintiff produced to support this claim is an untimely supplemental expert report. Dkt. #120-6. Plaintiff's expert reports were due on February 8, 2013. Dkt. #81. Plaintiff's experts James Kittrell and Carl Dupre filed their initial expert report on February 8, 2013, within the deadline. Although the initial report mentioned the 30-second default purge time on the EP160, the report contained no opinions about whether defendant Fireye's inclusion of a 30-second default purge time was unsafe or fell below the standard of care. In fact, the experts' discussion of the purge time related solely to defendant Whesco's actions. Dkt. #120-3 at 29-30.

Plaintiff filed a supplemental expert report on April 26, 2013, in which Kittrell and Dupre give the opinion that defendant Fireye should have foreseen that unqualified people would install the EP160 without reading instructions and without changing the default purge time to a purge time suitable for a particular boiler. Dkt. #120-6 at 7. These are new opinions and constitute improper supplementation. Therefore, I will not consider them.

However, even if I were to consider plaintiff's untimely expert submissions, I would conclude that plaintiff had failed to adduce evidence from which a reasonable jury could

17

conclude that defendant Fireye's inclusion of a 30-second default purge time was negligent or resulted in an unsafe product. Plaintiff's experts do not explain why Fireye should have known that unqualified technicians would install the EP160 programmer without reading the instructions regarding the dipswitch settings and without calculating the proper purge time for boiler #5. Plaintiff's experts state simply that Fireye "should have foreseen the possibility of installation of the EP160 programmer module, without change in the factory setting, into a boiler requiring a purge time greater than 30 seconds," dkt. #120-6 at 7, but they provide no explanation for this statement. Do unqualified technicians often install parts on boilers? Is it common for flame monitors and other boiler parts to be installed without changing the factory settings, even in situations involving commercial size and customized boilers? Plaintiff's experts do not say. Plaintiff cannot rely solely on the conclusory opinions of their experts to create a genuine factual dispute. General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997) ("nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert"). Therefore, I will grant defendant Fireye's motion for summary judgment on plaintiff's claims related to the default purge time.

3. Defect in Fireye's ability to monitor fuel change operations

Plaintiff contends that the Fireye flame monitor was defective because it should have contained a system to monitor unsafe conditions during automated fuel change operations. In particular, plaintiff contends that the Fireye system should have monitored duel fuel use

and low oxygen content and should have been designed to lock out the boiler in dangerous situations that arise during fuel change operations. Defendant Fireye responds that plaintiff misunderstands the purpose of the Fireye flame monitor system, which was intended only to sense the presence or absence of a flame within the boiler. According to Fireye, the Fireye flame monitor was not intended to supervise fuel change procedures or measure oxygen levels a burner; those roles should have been fulfilled by the Todd Combustion control system.

I conclude that plaintiff has presented sufficient evidence to defeat defendant Fireye's motion for summary judgment on this claim. In particular, plaintiff's experts gave the opinion that the fuel change procedure in boiler #5 presented unique hazards that could not be measured effectively by the existing burner control system. Dkt. #120-3 at 34-35. They also state that the Fireye flame monitor could have been designed to monitor fuel change procedures and oxygen levels and to lock down the system in unsafe conditions. Id. They conclude that Fireye's failure to provide adequate monitoring and the potential for lockdown during unsafe fuel change conditions rendered the Fireye inadequate for the conditions and contributed to the explosion. Id. A reasonable jury could rely on this evidence to conclude that Fireye acted negligently or created a product that was not reasonably safe. Therefore, I will deny defendant Fireye's motion for summary judgment on this claim.

ORDER

IT IS ORDERED that

1. Defendant Whesco, Inc.'s motion for summary judgment, dkt. #109, is DENIED.

2. Defendant Fireye, Inc.'s motion for summary judgment, dkt. #104, is GRANTED IN PART and DENIED IN PART.  The motion is granted with respect to plaintiff Lexington Insurance Company's claims that (1) Fireye breached a contract to which plaintiff was a third party beneficiary; (2) Fireye failed to provide adequate warnings with its Fireye flame monitor; and (3) Fireye designed its product with an unsafe default purge time.  The motion is DENIED in all other respects.

Entered this 16th day of August, 2013.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge